IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DIANE I. DESTEFANO | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security | : | NO. 07-3750 |

## **REPORT AND RECOMMENDATION**

ELIZABETH T. HEY
UNITED STATES MAGISTRATE JUDGE                    December  11, 2008

This action was brought pursuant to 42 U.S.C. § 405(g) to review the final

decision of the Commissioner of Social Security ("Commissioner"), denying an

application filed by Ms. DeStefano ("Claimant") for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act.  For the reasons that follow, I find that

there is substantial evidence to support the findings of fact and conclusions of law of the

Administrative Law Judge ("ALJ").  Therefore, I recommend that the final decision of the

Commissioner be affirmed.

## I.   <u>PROCEDURAL HISTORY</u>

Claimant filed for DIB on December 10, 2003, alleging disability as of March 3, 1998.  <u>Tr.</u> at 96-98.[1]  Claimant later amended the disability onset date to April 2001.[2]  Based on her insured status, Claimant was required to show that she became disabled on or before December 31, 2003.  <u>Id.</u> at 13; Pl.'s Br. at 2; 42 U. S. C. § 423(a), (c); 20 C. F. R. § 404.101.  The application was denied initially and Claimant requested an administrative hearing.  <u>Tr.</u> at 53-57, 48-54.[3]

On August 17 and December 28, 2005, an ALJ held hearings to consider the matter <u>de novo</u>.  <u>Tr.</u> 610-652, 568-609.  In a decision dated March 7, 2006, the ALJ denied the claim, finding that, although Claimant suffered from several severe

---

[1]Claimant filed a prior application on December 21, 1999, alleging the same disability onset date.  After the final administrative decision denying the prior application, Claimant filed an action in this court.  <u>DeStefano v. Massanari</u>, Civ. No. 01-4636.  On May 23, 2002, the late Honorable Herbert Hutton approved and adopted the Honorable Thomas Rueter's Report and Recommendation, concluding that the denial of benefits should be affirmed.  Any reference to Claimant's application in this Report refers to Claimant's current application for benefits, unless otherwise specified.

[2]At the hearing, Claimant's counsel stated that "we're only looking at the period after April of '01 for all intents and purposes," referring to the time period following the prior denial of benefits.  <u>Tr.</u> at 613.  Claimant now argues that the ALJ <u>de facto</u> reopened the record back to the original alleged onset date.  This argument is addressed <u>infra</u> in section IV. D.  The administrative record contains medical records back to the original onset date, and all the records will be considered in this Report.

[3]Technically, Claimant filed a request for reconsideration.  However, her application was subject to the modified rules governing disability determination procedures.  <u>See</u> 20 C. F. R. § 404.906(b)(4).  In the initial letter denying benefits, she was instructed to request a hearing.  <u>Tr.</u> at 55.  The SSA construed her request for reconsideration as one for an administrative hearing.  <u>Id.</u> at 52.

impairments, considered alone or in combination, these impairments did not equal one of

the listed impairments.  Id. at 17.  Considering Claimant's residual functional capacity

("RFC") and relying on the testimony of a Vocational Expert ("VE"), the ALJ concluded

that Claimant was not disabled.  Id. at 18.  On July 6, 2007, the Appeals Council denied

Claimant's request for review.  Id. at 4-6.  Therefore, the decision of the ALJ is the final

decision of the Commissioner.  20 C. F. R. §§ 404.981.

Claimant filed her Complaint in this action on September 21, 2007, and submitted

her Brief and Statement of Issues in Support of Request for Review on February 5, 2008.

Defendant responded on March 18, 2008.  The matter is now ripe for review.

## II.    LEGAL STANDARD

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. §§ 405(g), 1383(c)(3);

Richardson v. Perales, 402 U.S. 389 (1971); Hartranft v. Apfel, 181 F.3d 358, 360 (3d

Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to

support the Commissioner's conclusion that Claimant is not disabled.  Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate," and

must be "more than a mere scintilla."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 118

(3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)).  The court

has plenary review of legal issues.  Schaudeck v. Comm'r. of Soc. Sec., 181 F.3d 429,

431 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process in evaluating each case, determining:

> 1. Whether the claimant is currently engaged in substantial gainful activity;
>
> 2. If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;
>
> 3. If so, whether, based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1999), which results in a presumption of disability;
>
> 4. If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work; and
>
> 5. If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Allen v. Barnhart, 417 F.3d 396, 401 n.2 (3d Cir. 2005) (quoting Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000)) (internal citations omitted); see also 20 C. F. R. § 404.1520(a)(4).  The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age,

education, work experience and residual functional capacity.  Poulos v. Comm'r. of Soc.

Sec., 474 F.3d 88, 92 (3d Cir. 2007).

### III.   FACT RECORD AND THE ALJ'S DECISION

Claimant was born on September 8, 1958, and therefore was 42 years old at the

time of her alleged onset of disability in April 2001, and 45 years old when her insured

status expired on December 31, 2003.  Tr. at 96.  She has an eleventh grade education.

Id. at 230, 612.  Her past relevant work includes jobs as a nursing home care giver, meat

wrapper, paper delivery person, and gift shop owner.  Id. at 225.  She alleges disability as

a result of a combination of headaches, morbid obesity, depression, mood swings,

difficulty concentrating, sleep disturbance, difficulty tolerating medications, and

orthopedic problems involving her low back, neck, knees, shoulders, and feet.  See Pl.'s

Br. at 2 (citing tr. at 160, 167-76, 224, 615-37).

Claimant testified that she stopped working after a car accident that occurred in

March of 1998.  Tr. at 615.  As a result of the injuries she sustained in the accident,

Claimant claims to suffer from headaches, neck and back pain and spasms, pain down her

arms radiating into her hands, and numbness in her hands and legs.  Id. at 616, 621.  She

also suffers from a burning sensation in her feet for which she has had surgery.  Id. at

619-20.  She is 5 feet 1 inch tall, id. at 384, and steady weight gain following her injuries

places her in the category of morbid obesity.  Id. at 276 (220 lbs. on 11/30/98); 384-85

(227 lbs on 2/11/00, "morbid obesity"); 270, 429 (256 lbs on 10/8/01); 401-02 (240 lbs.

on 3/14/02); 427 (242 lbs. on 1/09/03); 535 (255 lbs. on 9/16/04); 464, 550 (258 lbs. on 11/29/04); 463, 549 (267 lbs. on 4/6/05); 529 (266 lbs. on 6/23/05).

Despite the adjudication of Claimant's earlier application for benefits, the administrative record contains treatment notes back to the accident, and some predating the accident.[4]  Prior to the accident, Claimant sought treatment from Thomas M. Herrmann, D.P.M., for tingling and numbness in her left foot, and pains shooting up her left leg, diagnosed as plantar fasciitis,[5] for which she underwent an endoscopic fasciotomy,[6] and recovered well after the surgery.  Tr. at 288, 326-27, 481-94.  After the car accident, Claimant was diagnosed with cervical/lumbar/thoracic sprain and strain, and a herniation at C6-7, resulting in back pain and tenderness, headaches, and limited range of motion.  Id. at 318, 328, 346.  Complaints of these same ailments (to varying degrees) continue throughout the administrative record.  Id. at 270-82 (3/9/98 - 10/19/01); 365-66 (5/5/98); 328-330 (11/19/98); 332-33 (12/10/98); 336-39 (2/7/2000); 383-85 (2/11/00);

---

[4]As discussed later in section IV. D., whether the pre-April 2001 medical record is considered to put Claimant's current claim in context or as evidence of a disability during any time prior to the expiration of her insured status, there is substantial evidence to support the ALJ's determination.

[5]Plantar fasciitis is the inflammation of the bands of fibrous tissue radiating toward the bases of the toes from the medial process of the tuber calcanei.  Dorland's Illustrated Medical Dictionary, 31st ed. 2007, ("DIMD"), at 119, 692.

[6]Fasciotomy is the surgical incision or transection of the fibrous tissue of the foot.  DIMD, at 693.

386-400 (3/12/98 - 9/13/01); 401 (3/14/02); 438 (5/3/01, 5/30/02); 437 (1/14/03); 536 (9/16/04).

In an effort to alleviate the pain associated with Claimant's back injury, Kathleen Kreider, M.D., Claimant's primary care physician, prescribed a TENS unit, and referred her for pain management and physical therapy.  Tr. at 281, 282, 319, 328, 346-52. Claimant also treated with Norman Stempler, D.O., an orthopedic surgeon, beginning on March 12, 1998.  Id. at 399.  Dr. Stempler's notes indicate his treatment of Claimant's neck pain, headache, radiculopathy,[7] and bursitis of the left shoulder.  Id. at 387.  The administrative record includes Dr. Stempler's notes from March 12, 1998, through January 8, 2004.  Id. at 387-99, 436-38.[8]

Two other examining physicians' reports appear in the record.  James D. Artuso, M.D., of the Central Pennsylvania Pain Center, examined Claimant at the request of Dr. Kreider, and Stanton Bree, D.O., examined Claimant on behalf of the SSA.  Tr. at 336-39,

---

[7]Radiculopathy refers to disease of the nerve roots.  Cervical radiculopathy often manifests as neck or shoulder pain.  DIMD, at 1595.

[8]The administrative record also contains medical reports post-dating the expiration of her insured status (December 31, 2003), including a progress note from Dr. Stempler. Tr. at 436.  Additionally, Claimant has had further treatment to her knees and feet in 2004 and 2005, including arthroscopic repair of a torn left medial meniscus and plantar fasciotomy of the right foot to address plantar fasciitis and calcaneal spurs.  Id. at 459-62, 474, 479, 481, 553, 562.

401-08.  The record also contains a report from V.H. Popat, M.D., a non-examining state agency physician who reviewed Claimant's medical records.  Id. at 411-18.[9]

The ALJ found through his review of the objective medical evidence, Claimant's testimony, and the testimony of a VE that, although Claimant could not perform her previous work, she could still engage in substantial gainful activity, and thus was not disabled.  The ALJ followed the five-step sequential analysis, and found as follows at each step:

1.  At step one, the ALJ found that Claimant had not performed any substantial gainful activity since the alleged onset of disability.  Tr. at 17.

2.  At step two, the ALJ found that Claimant's morbid obesity, cervical degenerative disc disease, right plantar fasciitis, headaches, and right knee degenerative joint disease status post surgery were severe impairments.  Id.[10]

3.  At step three, the ALJ found that Claimant's impairments did not meet or equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Id. at 18.

4.  In examining Claimant's residual functional capacity ("RFC"), the ALJ concluded that Claimant could perform a significant range of sedentary work, with the ability to lift or carry up to 10 pounds occasionally, stand and walk for 4 hours in an 8 hour day, sit for about 4 hours in an 8-hour workday, alternate between sitting and standing, push and pull as much as

[9]A detailed review of the physicians' treatment and findings follows in the discussion of Claimant's claims, infra section IV. A.

[10]Claimant had injured her right knee in a car accident pre-dating her claimed disability onset.  Tr. at 283.  Contrary to the ALJ's decision, it does not appear that she had surgery on the right knee at any time.  Id. at 383 (no knee surgery mentioned in prior surgical history).

she could lift and carry, and occasionally reach overhead.  She needed to avoid operating foot controls, climbing, balancing, stooping, kneeling, crouching, crawling, and concentrated exposure to noise.  Id. at 18.  Based on these limitations, the ALJ found that Claimant could not return to any of her past relevant work.  Id.

5.      At step five, the ALJ relied on the testimony of the VE.  Based on hypotheticals posed by the ALJ, the VE identified jobs that Claimant could perform including order clerk, information clerk, and telephone solicitor.  Id. at 18, 642-43.  The ALJ also found, based on the VE's testimony, that these jobs existed in significant numbers in the local and national economies.  Id.  The ALJ concluded on this basis that Claimant was not disabled.  Id. at 18.

In her Request for Review, Claimant argues that the decision of the ALJ is not supported by substantial evidence because (1) the ALJ failed to properly consider the opinions of Drs. Stempler and Kreider; (2) the ALJ erred in finding that Claimant could perform semi-skilled occupations while also concluding that she had no transferable work skills; and (3) the ALJ failed to consider the testimony of Claimant's husband.  In response, Defendant argues that the decision of the ALJ is supported by substantial evidence and any error by the ALJ is harmless.

IV.    **DISCUSSION**

A.      Failure to Consider Physicians' Opinions

Claimant first argues that the ALJ failed to properly consider the opinions of Drs. Kreider and Stempler.  See Pl.'s Br. at 4-10.  With respect to Dr. Kreider's opinion, Claimant complains that the ALJ improperly rejected her July 2005 RFC assessment, in which Dr. Kreider opined that Claimant could lift and carry only 5 pounds occasionally,

less than 2-3 pounds frequently, and was limited to sitting for 4 hours and standing/walking for only one hour in an 8-hour workday.  Tr. at 527.  The Commissioner responds that Dr. Kreider's most recent assessment is not supported by the contemporaneous objective findings of record.  See Resp. at 6.

In his decision, the ALJ stated that he rejected Dr. Kreider's July 2005 assessment because it "was rendered long after the claimant's date last insured."  Tr. at 15.  Seizing upon the ALJ's language, Claimant points out that Dr. Kreider stated in the July 2005 assessment that these limitations were present since April 24, 2001.  See Pl's Br. at 8; tr. at 527.[11]   If the ALJ's analysis were limited to the date of Dr. Kreider's report, I would agree with Claimant that the ALJ's rejection of Dr. Kreider's opinion, on this basis alone, is insufficient.

However, Claimant's argument overlooks the remainder of the ALJ's discussion of the medical evidence.  After reviewing the medical record, the ALJ concluded that Claimant's ability to perform a limited range of sedentary work is "supported by the medical and objective findings as well as the treatment history prior to claimant's date last insured."  Tr. at 15.  This conclusion is supported by substantial evidence.

In making this determination, I recognize that the opinions of a long-time treating physician, like Dr. Kreider, are entitled to great weight.  See Plummer v. Apfel, 186 F.3d

---

[11]April 24, 2001 is significant because it is the day after the prior ALJ's decision denying Claimant benefits.  It is also prior to the expiration of Claimant's insured status, December 31, 2003.

422, 429 (3d Cir. 1999) (citing <u>Rocco v. Heckler</u>, 826 F.3d 1348, 1350 (3d Cir. 1987)).

In fact, the governing regulation provides that a treating physician's opinion is entitled to

controlling weight when the opinion is well supported by the medically acceptable

clinical and laboratory diagnostic techniques, and not inconsistent with other substantial

evidence in the record.  20 C. F. R. § 404.1527(d)(2).  However, "an ALJ may reject a

treating physician's opinion on the basis of contradictory medical evidence, and may

afford a treating physician's opinion more or less weight depending upon the extent of

supporting evidence."  <u>Hild v. Astrue</u>, No. 07-cv-1648, 2008 WL 2944610, at *4 (M.D.

Pa. Jul. 28, 2008) (citing <u>Plummer</u>, 186 F.3d at 429).

 In this case, Dr. Kreider's conclusion that Claimant was incapable of even

sedentary work as of April 24, 2001, is inconsistent with her own records, as well as the

medical record as a whole.  The July 2005 RFC was the third that Dr. Kreider completed

for Claimant.  In both of the prior RFC's, Dr. Kreider's conclusions regarding Claimant's

limitations were consistent with sedentary work.[12]  <u>Tr.</u> at 322, 432-34.  The second of

these reports was prepared in November 2000, just five months prior to April 2001, the

date Dr. Kreider later indicated that Claimant's impairments precluded even sedentary

_____

 [12]Sedentary work involves lifting no more than ten pounds at a time and
occasionally lifting or carrying articles like docket files, ledgers, and small tools.  20
C.F.R. § 404.1567(a).  Although a sedentary job is defined as one which involves sitting,
a certain amount of walking and standing is often necessary in carrying out job duties.  <u>Id.</u>
Jobs are sedentary if walking and standing are required occasionally and other sedentary
criteria are met.  <u>Id.</u>

work.  In the November 2000 RFC, Dr. Kreider concluded that Claimant could occasionally lift and carry 10 pounds, stand/walk at least 2 hours in an 8-hour workday with the option to alternate sitting and standing.  Additionally Dr. Kreider opined that Claimant could not kneel, crouch, or crawl.  Id. at 433.  The ALJ's RFC determination is consistent with these limitations.

There is nothing reflected in Dr. Kreider's notes or the medical record for the intervening months to explain the increased limitations she determined existed as of April 24, 2001.  In fact, Dr. Kreider's notes for the intervening time include only two entries -- the receipt of a nutritional consultation report and the fact that the doctor called in a prescription to a pharmacy for Claimant.  Tr. at 271.  Thus, it does not appear that Dr. Kreider even saw Claimant between November 13, 2000 (when she found Claimant's limitations were consistent with sedentary work), and April 24, 2001 (when she opined that they were not).  Nor did she refer to any other test or evaluation conducted during that time period.

Moreover, the medical record as a whole supports the ALJ's determination that Claimant was capable of performing a significant range of sedentary work.  As previously discussed, Claimant was involved in a car accident on March 3, 1998.  Tr. at 282, 292.  Dr. Kreider originally diagnosed Claimant with a cervical strain.  Id. at 293.  An x-ray of the cervical spine done the day of the accident showed no fracture or dislocation, but revealed "mild osteophyte formation posteriorly at C5/6 and to a lesser extent C6/7.  No

neural foraminal encroachment is seen." Id. at 295.[13]   An MRI of the cervical spine done

in June 1998, revealed degenerative changes at the same cervical areas with osteophyte

formation at both, a small disc herniation at C6/7 with no cord compression,[14] and a disc

protrusion at C5/6 that also did not result in cord compression.  Id. at 313.

In addition to the cervical impairments evidenced by the x-ray and MRI, Dr.

Stempler also diagnosed Claimant with radiculopathy.  Tr. at 438.  For these impairments,

Dr. Stempler prescribed Esgic[15] on 3/23/98, 2/1/99, and 5/3/01, id. at 398, 394, 387,

Arthrotec[16] on 12/22/98, id. at 395, Celebrex[17] on 8/19/99, 4/27/00, 9/18/00, 10/26/00,

2/20/01, and 5/3/01, id. at 393, 391, 387-89, low dose Elavil[18] on 12/9/99, id. at 392, a

---

[13]Osteophyte refers to a bony excrescence or osseous outgrowth.  DIMD, at 1369.

[14]John A. Gastaldo, M.D., a neurosurgeon who reviewed the MRI and examined Claimant at Dr. Kreider's request, concluded that there was a disc protrusion, not a "true herniation" at C6/7.  Tr. at 333.

[15]Esgic is a combination of Butalbital, Acetaminophen, and Caffeine.  Physicians' Desk Reference, 62nd ed. 2008, ("PDR"), at 1168.  Butalbital, Acetaminophen and Caffeine capsules are indicated for the relief of the symptom complex of tension (or muscle contraction) headache.  See http://www.drugs.com/pro/esgic-plus.html (last visited November 18, 2008).

[16]Arthrotec is a non-steroidal, anti-inflammatory drug used in the treatment of osteo- and rheumatoid arthritis in patients at high risk of developing NSAID-induced gastric and duodenal ulcers and their complications.  PDR, at 3060.

[17]Celebrex is a non-steroidal, anti-inflammatory drug indicated in the treatment of, among other things, the signs and symptoms of osteo- and rheumatoid arthritis, and for the management of acute pain.  PDR, at 3066.

[18]Elavil a brand name for amitriptyline, which is indicated for the treatment of depression.  See http://www.drugs.com/elavil.html (last visited November 18, 2008).

home traction unit on 5/27/99, id. at 394, and heat and bedrest on 10/26/00, id. at 388.  He also injected Claimant's left shoulder with steroids in September 2001.  Id. at 387.

In February 2000, Dr. Kreider sent Claimant to the Central Pennsylvania Pain Center, where she was evaluated by James D. Artuso, M.D., who found that Claimant could "ambulate freely without difficulty," and found that she had normal range of motion of the upper extremities and "relatively well preserved flexion and rotation of the neck, [and] limited extension secondary to the discomfort in the neck region."  Tr. at 338. Dr. Artuso noted that Claimant exhibited tenderness in the scalp, neck, and upper and lower back.  Id. at 338.  He concluded that there was "no dermatomal prevalence for her condition or anatomic explanation for the regions of discomfort," and noted that "[s]he displays true symptom magnification to light touch."  Id. at 338.

Claimant was also seen twice by Stanton Bree, D.O., at the request of the SSA.  In February 2000, Dr. Bree noted that Claimant was able to get undressed, get on and off the examination table, get dressed without assistance, and had a normal gait.  He performed a straight leg raising test, which was negative.[19]  He also noted "[t]here was exaggerated pain response to very light palpation of the cervical, thoracic, and lumber paraspinal muscles."  Tr. at 383-85.  Dr. Bree again saw Claimant in March of 2002, after the point

---

[19]The straight leg raising test is performed to determine the presence of a herniated disc.  "A positive test for herniated disc produces pain down the back of the leg, below the knee, when the leg is raised."  See http://webmd.com/back-pain/medical-history-and-physical-exam-for-a-herniated-disc (last visited November 18, 2008).

14

that Dr. Kreider concluded that Claimant was incapable of sedentary work.  He noted that

"Waddell's sign for symptom magnification was positive with head compression, skin

pinching and hip rotation."[20]  Id. at 402.  Dr. Bree completed an RFC, finding that

Claimant could occasionally lift and carry up to 20 pounds, stand and walk 3 hours in an

8-hour workday, and had no limitation in sitting.  Id. at 405-06.[21]  Additionally, Dr.

Artuso commented on the minimal objective medical findings supporting Claimant's

complaints.  Id. at 338 ("I do not feel that they [the clinical findings] can explain her

present painful condition" and ""she has minimal limitations due to her present

condition").

    Finally, the ALJ also relied on Claimant's limited treatment regimen during the

relevant time.  Tr. at 15.  Claimant did not see Dr. Stempler from September 2001 to May

2002, and then saw him once in January 2003, and a year later in 2004.  Id. at 436-38.

Similarly, she saw Dr. Kreider for treatment of her blood pressure in February 2002, and

sought no further treatment until January 2003, when she went to discuss results of

bloodwork.  Id. at 427-28.

---

[20]"Waddell's signs are special maneuvers used to evaluate persons when exam findings are inconsistent. A positive Waddell's sign generally indicates a nonphysiological etiology of pain."  See http//www.medscape.com/viewarticle/425143 (last visited on November 18, 2008).

[21]Dr. Popat, a non-examining consultative physician, opined that Claimant could occasionally lift and carry 50 pounds, frequently lift and carry 25 pounds and stand and sit for 6 hours each in an 8-hour workday.  Tr. at 412.  The ALJ did not rely on Dr. Popat's opinion, and therefore I will not rely on it in this Report.  Id. at 15 (referring to Exhibit 6F).

Guided by the substantial evidence standard, I conclude that there was substantial evidence to support the ALJ's decision and his rejection of Dr. Kreider's July 22, 2005 RFC. In the July 2005 RFC, Dr. Kreider specifically noted that Claimant's chronic low back pain is the basis for the limitations that she found. However, Drs. Artuso and Bree questioned the existence of any physiological basis to explain Claimant's complaints of pain. Tr. at 338, 383-85. In addition, Dr. Kreider failed to explain any reason for Claimant's deterioration in the five months since the doctor found Claimant capable of sedentary work. Moreover, the ALJ's determination was consistent with Dr. Kreider's earlier RFC determinations, and that of Dr. Bree, completed in March of 2002.

Claimant also complains that the ALJ improperly rejected Dr. Stempler's opinion, failing to acknowledge that it was rendered by a long-term, treating specialist. In a progress note from January 14, 2003, Dr. Stempler stated that Claimant "remains totally disabled at the present time for any gainful employment." Tr. at 437. The ALJ dismissed this opinion as "inconsistent with the claimant's limited treatment history" and unsupported "by an assessment of specific functional restrictions." Id. at 15. The Commissioner argues that Dr. Stempler's statement is not entitled to deference because it is a legal conclusion, not a medical determination. I agree that Dr. Stempler's disability determination is not entitled to deference. Moreover, as previously discussed, the medical record as a whole does not support such limitation.

16

"An ALJ need not defer to a treating physician's opinion about the ultimate issue of disability because that determination is an administrative finding reserved to the Commissioner." Salles v. Comm'r of Soc. Sec., 229 Fed. Appx. 140, 148 (3d Cir. 2007) (citing 20 C. F. R. § 404.1527(e)); Karahalias v. Barnhart, No. 03-5149, 2005 WL 418681, at *2 (E.D. Pa. Feb. 22, 2005) ("[T]he ultimate disability determination is reserved exclusively to the Commissioner and the ALJ is not required to give any special weight to a treating physician's determination thereof."). Dr. Stempler's progress note was not based on any new examinations or tests and did not explain the basis for his conclusion. Thus, the latter progress note simply rendered an unsupported opinion reserved to the Commissioner and is not entitled to deference. Further, while the progress note states that Claimant "remains" disabled, Dr. Stempler's earlier progress note mentioning disability, in July of 1998, stated that she was "disabled for any strenuous physical labor," and not able to "return to the type of job she had in the past which dealt with lifting, pushing, and pulling individuals in a care center." Tr. at 397. The ALJ's RFC is consistent with this earlier assessment.

Moreover, as previously discussed, Dr. Stempler's conclusion is inconsistent with Dr. Kreider's RFC from November 2000, and the opinions of Drs. Bree and Artuso. Therefore, I find no error.[22]

---

[22]There is also a progress note dated February 21, 2005, from Joseph P. Guagliardo, D.O., stating that Claimant is disabled as a result of her 1998 accident. Tr. at 552. There is no other reference to Dr. Guagliardo in the medical record. Counsel

Finally, Claimant argues that "it is likely" that Claimant's impairments worsened after 2000 in light of her weight gain.  See Pl.'s Br. at 9.  Without a medical record supporting such a likelihood, the weight gain in and of itself does not establish Claimant's disability.  Moreover, the doctors who provided RFC assessments were obviously aware of Plaintiff's weight and found her capable of sedentary work despite her weight.

B.     Transferrable Skills

At step five of the sequential evaluation, the burden shifts to the Commissioner to establish that there are jobs existing in significant numbers in the national economy which the Claimant can perform in light of her age, education, work experience, and residual functional capacity.  Barnhart v. Thomas, 540 U.S. 20, 24 (2003) (citing 20 C. F. R. §§ 404.1520, 404.1560).  Here, Claimant points to an inconsistency in the ALJ's decision in arguing that the Commissioner failed to meet his burden at step five.  See Pl.'s Br. at 10-11.  In his opinion, the ALJ states that Claimant "has no transferable skills from any past relevant work."  Tr. 16, 18.  Yet, in identifying jobs that Claimant could perform, the ALJ relied on three semi-skilled positions Claimant had never previously performed.[23]  The

referred to him as a pain doctor in his opening statement to the ALJ, and Claimant identified him as Dr. Stempler's partner.  Id. at 614, 625.  His unsupported conclusion that Claimant is disabled suffers from the same problems as Dr. Stempler's January 2003 progress note.

[23]Semi-skilled work needs some skill but does not require doing the more complex work duties.  Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but

Commissioner concedes that the ALJ "may have erred in finding no transferrable skills," see Resp. at 10, but contends that substantial evidence nonetheless supports the conclusion that Claimant is able to perform the jobs identified by the VE.

In determining whether a claimant can perform other work, the Commissioner must consider whether he or she has transferable skills from his/her past work.  See 20 C. F. R. § 404.1568(d).  Here, the VE specifically testified that Claimant had transferable skills.  He identified Claimant's job as a gift shop owner as a skilled occupation, and Claimant's work as a resident advisor or personal care assistant and as a nurse's aide as semi-skilled work.  Tr. at 640.  The VE explained that, as a gift shop owner, Claimant had acquired skills in dealing tactfully with the general public and decision making skills based on business data, statistical data, preparing budgets, and keeping records which is primarily associated with inventory and sales.  Id. at 641.

In identifying jobs that Claimant could perform based on her residual functional capacity, the VE identified an information clerk, telephone solicitor, and order clerk.  All three are semi-skilled sedentary positions, and the VE noted that Claimant acquired the skills required for these jobs as a store owner.  Tr. at 644.  Thus, the evidence supports the ALJ's conclusion that Claimant can perform these three jobs, despite the inexplicable finding that Claimant had no transferable skills.[24]

_____

more complex than unskilled work.  20 C. F. R. § 404.1568(b).

[24]I note that the ALJ who considered the prior application concluded that Claimant had transferable skills.  Tr. at 34, 36.

The Commissioner urges this court to apply a theory similar to the harmless error analysis.  Simply stated, remand is not necessary when the same result would be obtained.  There is support for the Commissioner's position.  See Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005) (remand unnecessary when it would not affect the outcome of the case); Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

This case is remarkably similar to Guske v. Apfel, 156 F.3d 1237, 1998 WL 476117 (9th Cir. 1998) (table), in which the Ninth Circuit declined to remand a case to the Commissioner when a similar inconsistency existed in the ALJ's decision.  The ALJ found the Claimant capable of performing certain semi-skilled positions while concluding that he had no transferable skills, and the appellate court affirmed in its unpublished opinion:

> While the ALJ's findings were inconsistent, his finding that [Claimant] had no transferrable skills was not supported by the record. Thus, we conclude that the inconsistent findings constitute harmless error because the record supports the vocational expert's testimony as adopted by the ALJ.

Id. at *2.

Here, the VE's testimony clearly established that Claimant has skills that are transferable to the jobs he identified.  The ALJ obviously credited the VE's testimony

with respect to Claimant's ability to perform these jobs. Tr. at 17. Remand would serve no purpose other than allowing the ALJ to correct his finding that Claimant had no transferable skills. Because remand would not affect the outcome of the case, I conclude that substantial evidence supports the ALJ's conclusion.

C.     Evaluation of Witness Testimony

Finally, Claimant argues that the ALJ failed to consider the testimony and written statements offered by Claimant's husband. See Pl.'s Br. at 11-13. At the administrative hearing held on August 17, 2005, the ALJ asked for the tax returns regarding a business called Diane's Gifts, which Claimant's husband and daughter ran on eBay. Tr. at 632, 652.[25] It was clear from the ALJ's questions during that hearing that he questioned what role, if any, Claimant played in the day-to-day operation of the business. Id. at 632-34. The hearing was later resumed and Mr. DeStefano's testimony was offered to address the ownership of and Claimant's involvement in the business. Id. at 115, 572.[26] He described the activities involved in running the business and assured the ALJ that he and his daughter performed substantially all of them, except a trip to the bank or post office if Claimant was already planning to go for personal reasons. Id. at 589, 597. Although he

---

[25]Prior to the accident in 1998, Claimant operated two store-fronts at local farmers' markets and operated a Dollar Store, which, according to Claimant's husband, continued operating until January of 1999. Tr. at 127-29, 573-74. Claimant's husband and daughter proceeded to sell-off the inventory from the Dollar Store at auction, yard sales, and on eBay, id. at 576-77, and purchased new inventory to sell on eBay. Id. at 578.

[26]In a letter dated August 20, 2005, Mr. DeStefano also addressed the issues related to ownership of the business. Tr. at 127-29.

testified that his wife cannot work, id. at 586, Mr. DeStefano did not testify as to her specific abilities or limitations.  Previously, in a Daily Activities Questionnaire dated January 15, 2002, Mr. DeStefano provided a somewhat more detailed description of his wife's activities and limitations.  Id. at 213-17.

Claimant complains that the ALJ did not consider the statements and testimony of her husband in violation of the Third Circuit's decision in Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000).  In Burnett, where there was no evidence that the ALJ considered certain non-medical testimony, the Third Circuit remanded the case to the Commissioner for, among other things, consideration of testimony offered by Claimant's husband and neighbor, which bolstered Claimant's credibility.  Id. at 122.

The Commissioner argues that Mr. DeStefano's testimony "actually casts doubt" on Claimant's testimony, and cites instances where their testimony conflicts.  See Resp. at 12.  Additionally, the Commissioner notes that even if Mr. DeStefano's testimony were relevant and probative, the medical evidence does not support the claimant's alleged limitations.  See id. at 12-13.

The ALJ obviously did consider and credit Mr. DeStefano's testimony and the evidence he presented regarding his wife's lack of involvement in the operation of the business, because the ALJ concluded that Claimant had not engaged in any substantial gainful activity since the alleged onset of disability.  Tr. at 17.  Moreover, Mr. DeStefano's responses in the questionnaire did not particularly bolster the Claimant's

case.  Although Mr. DeStefano explained that he has to help with the cleaning and cooking and that there are days when Claimant does not feel well enough to tend to her own personal needs, id. at 213-14, when asked about Claimant's daily activities, he responded, "I can't explain it.  Every day is different and I don't always wake-up before she does."  Id. at 215.

Additionally, even were I to find that Mr. DeStefano's questionnaire bolstered Claimant's credibility, district judges in our circuit who have addressed the issue raised in Burnett have applied a harmless error analysis.  Thus, the ALJ's failure to address non-medical testimony has not required a remand where the medical evidence in the record supported the ALJ's RFC determination.  See Carnes v. Comm'r of Soc. Sec., No. 08-99, 2008 WL 4810771, at *5 (W.D. Pa. Nov. 4, 2008) (Standish, J.); Combs v. Barnhart, No. 03-5526, 2005 WL 1995457, at *1-2 (E.D. Pa. Aug. 16, 2005) (Reed, J.).  Having found that the medical evidence does support the ALJ's RFC determination, I find no basis to remand the case.

D.     De Facto Reopening

As previously mentioned, Claimant filed an earlier application for benefits on December 21, 1999, alleging disability as of March 3, 1998.  See supra, at 2 n.1.  The application was denied at the administrative level and, on judicial review, the Commissioner's findings were found to be supported by substantial evidence.  Claimant filed the current application for benefits on December 10, 2003.

In her Request for Review, Claimant argues that the ALJ's consideration of her claim since March 3, 1998, constitutes a <u>de facto</u> reopening of the prior decision.  <u>See</u> Pl's Br. at 2 n.2.  The Commissioner failed to address this issue in his response.  Because I conclude that the Commissioner's decision denying benefits is supported by substantial evidence, the reopening issue is moot.  However, if the District Court disagrees with my conclusion, the reopening issue will be relevant.  Therefore, in an abundance of caution, I will proceed to address the issue.[27]

Although the court cannot review the decision of the Commissioner declining to reopen a claim, the court can review the record to determine whether a reopening has occurred.  <u>Coup v. Heckler</u>, 834 F.2d 313, 317 (3d Cir. 1987) (abrogated on other grounds by <u>Gisbrecht v. Barnhart</u>, 535 U.S. 789 (2002)) (citing <u>Califano. Sanders</u>, 430 U.S. 99 (1977)).  A reopening will be found "where the administrative process does not address an earlier decision, but instead reviews the entire record in the new proceeding and reaches a decision on the merits . . . ." <u>Id.</u> (citing <u>Kane v. Heckler</u>, 776 F.2d 1130, 32 (3d Cir. 1985)).

---

[27]If the District Court found that Claimant was entitled to benefits and found that the prior application was reopened, Plaintiff would be entitled to benefits for the twelve months prior to the filing of her first application for benefits.  <u>See</u> 20 C. F. R. § 404.621(a).

In 2002, the Third Circuit had the opportunity to apply Coup to determine whether

a de facto reopening had occurred in a disability case.  Kaszer v. Massanari, 40 Fed.

Appx. 686 (3d Cir. 2002).

> We think that Coup requires that the ALJ "address" the earlier
> decision vis-a-vis res judicata.  The agency must address
> whether the prior adjudication will be used for its preclusive
> effect or whether it will be reopened. [Where n]o such
> expression was made . . . , we move on to the second part of
> the Coup test to see if the ALJ reviewed the entire record in
> the new proceeding and reached a decision on the merits.

Id. at 693-94.  Thus, "[t]he first question . . . is whether the ALJ addressed the earlier

decision."  Id. at 693.  In Kaszer, the court found that the ALJ had not addressed whether

the earlier decision would be used for its preclusive effect, so the court went on to review

the record and determined that the ALJ had conducted a "careful consideration of all the

evidence . . . such that her actions were sufficient to reopen Kaszer's first application de

facto."  Id. at 695.

Unlike Coup and Kaszer, the reopening issue was addressed in this case.  Although

the prior decision was merely mentioned by the ALJ in his decision, tr. at 12, at the

administrative hearing, the ALJ acknowledged the earlier decision, saying that Claimant

"had her day in court."  Id. at 613.  Claimant's attorney similarly acknowledged that the

current case involved only the time after the earlier decision.

> I should probably also add, as I indicated and I explained to
> [Claimant] that we're only looking at the period after April of
> '01 for all intents and purposes. . . . And this is not a
> concurrent claim, so we're pretty much looking at that

> window and I believe she understands.  I explained that to
> her.  But nevertheless, during that time, Your Honor, going
> back to April '01, [the prior ALJ] did find she was limited to
> sedentary work with a sit/stand option and I'd submit that
> there is some indication of some worsening since that period
> of time.

Id. at 613-14.

Thus, in answer to the first question posed by Coup, the administrative process did

address the earlier decision.  Both the ALJ and Claimant's own attorney acknowledged

that the current case only dealt with Claimant's condition after April of 2001.

Despite this acknowledgment at the administrative hearing, in her brief, Claimant

argues that the ALJ's consideration of all of the evidence supports the de facto reopening.

See Pl's Br. at 2 n.2.  However, it is clear from the record and even counsel's opening

statement at the administrative hearing that review of the prior medical evidence was for

the purpose of putting Claimant's current claim in context, not for purposes of reviewing

the prior disability decision.  Claimant bases her disability on a worsening of the

conditions complained of in the earlier filed disability claim.  Thus, review of the doctors'

earlier assessments was necessary to determine the deterioration in Claimant's condition.

As stated by counsel at the administrative hearing,

> But nevertheless, during that time, Your Honor, going back to
> April '01, [the prior ALJ] did find she was limited to
> sedentary work with a sit/stand option and I'd submit that
> there is some indication of some worsening since that period
> of time.  And I think that's reflected, the treating physician
> Dr. [Kreider] had done medical source statements in 2000 as
> well as in '98 indicating that the patient could do at least

> sedentary work back then and she has since, more recently,
> indicated greater limitations and I think that's supported by
> the ongoing nature of her spinal problems, as well as the
> recurrence of the knee, or the bilateral foot problems.

Tr. at 614.

Thus, at the administrative hearing, Claimant's counsel recognized the need to consider Claimant's prior medical history to put her current claim in perspective, while acknowledging that he was only alleging disability since April 2001. To then argue that the ALJ's review of the earlier evidence operated to reopen the prior case is disingenuous. I do not believe the ALJ's consideration of the evidence, after counsel acknowledged the relevant time period at the administrative hearing and suggested review of the record was necessary to evaluate the current claim, resulted in a de facto reopening.

Even if I were reviewing the denial of the prior claim, I would find substantial evidence to support the ALJ's decision, including the RFC's completed by Dr. Kreider concluding that Claimant was capable of performing sedentary work. Because the only evidence of disability is contained in evaluations performed well after the first application was denied, consideration of the earlier medical record would have no impact on the ultimate disability determination.

Therefore, I make the following:

## <u>R E C O M M E N D A T I O N</u>

AND NOW, this   11th       day of      December            , 2008, it is

RESPECTFULLY RECOMMENDED that the Commissioner's decision denying benefits

be AFFIRMED.  The petitioner may file objections to this Report and Recommendation.

<u>See</u> Local Civ. Rule 72.1.  Failure to file timely objections may constitute a waiver of any

appellate rights.

BY THE COURT:


/s/ ELIZABETH T. HEY

_____

ELIZABETH T. HEY
UNITED STATES MAGISTRATE JUDGE